IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:16-CV-00225-RLV-DCK

| FRANK GULYAS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **ORDER** |
| APPALACHIAN STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA, CINDY A. WALLACE, in her individual and official capacities, JUDITH HASS, in her individual and official capacities, DAVID J. ELROD, in his individual and official capacities, and DARRELL P. KRUGER, in his official capacity, | ) | |
| Defendants. | ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendants' Motion to Dismiss (Doc. 27). The parties have filed their respective briefs (Docs. 28, 29, 30) and this matter is ripe for disposition. For the reasons stated below, Defendants' Motion to Dismiss (Doc. 27) is **GRANTED IN PART** and **DENIED IN PART**.

I. FACTUAL ALLEGATIONS & PROCEDURAL BACKGROUND

In fall semester of 2014, Plaintiff Frank Gulyas started his sophomore year at Appalachian State University ("App. State" or the "University"), a collegiate institution within the University of North Carolina system. (*See* Doc. 1 at 1). In October 2014, Plaintiff and Melissa Costa, who lived in the same co-ed dormitory building, commenced an exclusive dating relationship. *Id.* at 2. The relationship between Plaintiff and Costa proved rocky, and Plaintiff alleges that Costa frequently exhibited "extreme jealousy" when she observed other females interacting with him. *Id.* On the evening of February 21, 2015, Plaintiff, a friend of Plaintiff's, and the sister of

1

Plaintiff's friend attended a party. *Id.* The party lasted late into the night and by the time Plaintiff left the party, his friend's sister was unable to return to the dorm room where she had intended to spend the night. *Id.* Plaintiff invited his friend's sister to spend the night in his dorm room, which Plaintiff's roommate also occupied. *Id.* Costa learned that a female was staying in Plaintiff's dorm room, entered Plaintiff's room, and cursed at, yelled at, kicked, and hit Plaintiff. *Id.* at 3. Costa briefly left Plaintiff's room but, soon thereafter, reentered his room to return several of Plaintiff's clothing items and to further berate Plaintiff. *Id.*

According to Plaintiff, the events on the night of February 21, 2015 marked the official end of his and Costa's exclusive relationship. *Id.* Nonetheless, Plaintiff and Costa continued to sporadically hang out and spend nights in each other's rooms, in what might be best described as a casual relationship. *See id.* During spring break, Plaintiff commenced a relationship with another female and informed Costa of such once classes were back in session. *Id.* Costa did not take well to this information and sent Plaintiff a series of "increasingly angry and hostile" texts. *Id.* On March 28, 2015, approximately ten days after informing Costa of his new relationship, Plaintiff went to Costa's dorm room to fully end his relationship with Costa. *Id.* When he arrived at Costa's dorm room, he found the door to her room ajar, he tapped on the door, and then entered Costa's room. *Id.* With Costa's roommate present, Plaintiff and Costa commenced a conversation about the end of their relationship. *Id.* During the conversation, Costa's roommate left, Costa began to cry, and Plaintiff attempted to comfort her by placing his hand on her upper arms. *Id.* at 4. The two continued their conversation until Costa's roommate returned, at which point Costa and her roommate asked Plaintiff to leave. *Id.* Plaintiff complied with this request and left Costa's room. *Id.*

On March 30, 2015, Costa filed a criminal trespassing charge relative to Plaintiff's entry into her dorm room on March 28, 2015. *Id.* Costa also filed a 50B Complaint with a motion for a domestic violence protective order ("50B Complaint"), in which she alleged that Plaintiff threatened to kill her and kill her family if she told people any of his secrets. *Id*. On April 1, 2015, Costa filed a second criminal charge against Plaintiff, this one for communicating threats. *See id.* In early April 2015, Costa also filed a complaint with Defendant App. State. *Id.* In her complaint with App. State, Costa accused Plaintiff of harassment, unauthorized entry into her dorm room, making threats, and causing bodily harm. *Id.*

App. State commenced its investigation into the matter on April 8, 2015, assigning Investigator Stacy Sears to the matter. *Id.* During the course of the investigation, Sears learned of the February 21, 2015 altercation between Costa and Plaintiff. *Id.* Sears reported the events of February 21, 2015 to Defendant David J. Elrod and to Defendant Judith Hass but was instructed to investigate only Costa's complaint about the events of March 28, 2015 and to omit details of the February 21, 2015 incident from her investigation report. Relative to the February 21, 2015 incident, the investigation report, which is provided to the University Conduct Board, read: "On the night of February 21/22 [Plaintiff] and [Costa] had an argument and decided to stop dating." *Id.*

In September 2015, proceedings on Costa's 50B Complaint commenced, with the 50B Court taking testimony from witnesses on Thursday, September 17 and Friday, September 18. *Id.* at 5. Defendant Elrod testified at the hearing, observed the testimony of several witnesses who provided testimony adverse to Costa's allegations, and was aware that the 50B Court scheduled a final day of hearing testimony, to include the subpoenaed testimony of Investigator Sears, for Monday October 5, 2015. *Id.* On Saturday, September 19, Defendant Elrod issued Plaintiff an

"official notice" that formally advised Plaintiff of the charges against him and informed him that his University Conduct Board hearing was scheduled for Friday, October 2, 2015. *Id.* Plaintiff moved to continue his student conduct hearing and Defendant Elrod denied the motion. *Id.* The University Conduct Board hearing occurred on Friday, October 2, 2015, with several students testifying but Investigator Sears not appearing. *Id.* at 6. On October 5, 2015, the Rule 50B Court held its final hearing on Costa's 50B Complaint, during which Investigator Sears testified about the events of February 21, 2015 and Defendant Elrod's and Defendant Hass's directive to Sears about not including the events of February 21 in her investigation report. *Id.* at 5-6. Prior to Sears's testimony at the 50B Complaint hearing on October 5, 2015, Plaintiff was unaware that Defendant Elrod and Defendant Hass had directed Sears not to investigate the February 21 incident and to omit details of the incident from the investigation report provided to the University Conduct Board. *See id.* at 4-5.

The 50B Court concluded that Costa did not present sufficient proof to sustain her burden and dismissed her 50B Complaint. *Id.* at 6. On October 7, 2015, the University Conduct Board found Plaintiff "responsible" for "unlawful entry" and for "acts of harm," suspended Plaintiff for the remainder of the fall 2015 academic term, and required Plaintiff to meet certain conditions before he could return to App. State in a future semester. *Id.* Plaintiff appealed the University Conduct Board's decision, raising several procedural and evidentiary challenges and noting that he was not provided a copy of his hearing transcript for purposes of appeal. *Id.* at 6-7. On November 10, 2015, Plaintiff received a letter from Defendant Cindy A. Wallace that indicated that his appeal had been denied. *Id*. at 7. On November 17, 2015, the district attorney dismissed the criminal charges filed by Costa. *Id.*

In January 2016, Plaintiff filed an initial action against Defendants. *Gulyas v. Appalachian State University*, Case No. 5:16-cv-00028-RLV-DSC, Doc. 1-1. After removal of the action to federal court and with a pending motion to dismiss by Defendants, Plaintiff voluntarily dismissed his initial action pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). *Id.* at Doc. 20. Plaintiff filed the pending complaint in December 2016. Plaintiff's pending complaint raises five causes of action: (1) denial of due process as guaranteed by Article 1, Section 19 of the North Carolina Constitution (Count One); (2) denial of due process as guaranteed by the Fourteenth Amendment of the United States Constitution (Count Two); (3) denial of the right to equal protection under the law as guaranteed by the Fourteenth Amendment of the United States Constitution (Count Three); (4) denial of the right to equal protection under the law as guaranteed by Article 1, Section 19 of the North Carolina Constitution (Count Four); and (5) discrimination on the basis of gender in violation of Title IX, 20 U.S.C. § 1681 (Count Five). *Id.* at 8-12. Plaintiff's pending complaint seeks relief in the form of an order requiring App. State to expunge his record of any suspension and incomplete grades, compensatory damages, litigation costs, and attorney fees. *Id.* at 12. Defendants move to dismiss Plaintiff's pending complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), generally arguing that Plaintiff does not allege facts that can support a constitutional due process violation, that Plaintiff does not allege facts demonstrating that he was similarly situated to another female student or that any defendant treated him differently on the basis of his gender/sex, that Plaintiff did not exhaust all available state law remedies before bringing his state constitutional claims, and that the Defendants named in their individual capacity are entitled to qualified immunity. (Doc. 27, Doc. 28 at 7-22).

## II. DISCUSSION

### A. Standard of Review

When reviewing a motion to dismiss, a court must examine the legal sufficiency of the complaint; it may not resolve factual disputes or weigh the claims and defenses against one another. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Further, a court must accept as true all of the well-pled factual allegations contained in the complaint. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). While Fed. R. Civ. P. 8(a) does not require "detailed factual allegations," a complaint must offer more than "naked assertion[s]" and unadorned "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order to survive a motion to dismiss, the facts alleged must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Requiring plausibility "does not impose a probability requirement at the pleading stage," *id.* at 556, but does demand more than a "sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. Ultimately, a claim is facially plausible when the factual content allows for the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

### B. Fourteenth Amendment Procedural Due Process Claim[1]

#### i. *Legal Standard*

To raise a procedural due process claim under the Fourteenth Amendment, a Plaintiff must allege "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." *Iota*

---

[1] As Plaintiff's procedural due process claim only identifies Defendants Haas, Wallace, and Elrod (*see* Doc. 1 at 9-10), this Court construes the claim as only arising against those three Defendants and not against Defendants Appalachian State University, University of North Carolina, or Darrell P. Kruger.

*Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)). For purposes of their motion to dismiss, Defendants only challenge whether Plaintiff's Complaint contains allegations capable of supporting the third element of a procedural due process claim. (*See* Doc. 28 at 7-16). On the most basic level, due process requires that a university student facing suspension or expulsion receive (1) "adequate notice of the charges against him"; (2) "the opportunity to be heard by disinterested parties"; (3) the opportunity to be "confronted by his accuser[]"; and (4) "the right to have a record of the hearing reviewed by a student appellate body." *Henson v. Honor Comm. of the Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983). The opportunity to be heard is not a pro forma requirement and, instead, entails providing the accused student "the opportunity to be heard at a *meaningful time* and in a *meaningful manner*." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). The "timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved," namely the risk to the accused of the hearing resulting in an errant result and the unfair or mistaken suspension of the accused versus the need of the educational institution to instill order and discipline and to foster a safe environment conducive to learning. *See Goss v. Lopez*, 419 U.S. 565, 579-81 (1975) (discussing procedural due process in context of high school setting). Ultimately, whether the procedures employed in a given case satisfy procedural due process requirements depends on three variables: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [university's] interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews*, 424 U.S. at 335.

7

"Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights"; thus, an accused student must be permitted the opportunity to "tell his side of the story in order to make sure that an injustice is not done." *Goss*, 419 U.S. at 580 (brackets and internal quotation marks omitted). To help ensure fairness and the accused's ability to meaningfully present his side of the story, due process requires that a university provide the accused with the names and a summary of the testimony of the witnesses against the accused and that the university give the accused an opportunity to present evidence, including oral testimony or written affidavits from witnesses. *Sohmer v. Kinnard*, 535 F. Supp. 50, 53 (D. Md. 1982) (citing *Dixon v. Alabama Bd. of Educ.*, 294 F.2d 150, 158-59 (5th Cir. 1961), *Herman v. Univ. of South Carolina*, 341 F. Supp. 226, 230-31 (D.S.C. 1971), *aff'd*, 457 F.2d 902 (4th Cir. 1972)), *see also Henson*, 719 F.2d at 74 ("Although *Dixon* was decided more than twenty years ago, its summary of minimum due process requirements for disciplinary hearings in an academic setting is still accurate today."). However, due process does not require university hearing boards to employ procedures equivalent to those afforded to a criminal defendant. *Henson*, 719 F.2d at 74; *see also Doe v. Cummins*, 662 F. App'x 445, 446 (6th Cir. 2016) ("[D]isciplinary hearings against students are not criminal trials, and therefore need not take on many of those formalities." (ellipsis omitted) (quoting *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005))). To that point, courts have declined to conclude that due process requires a university to (1) provide an accused student with counsel, *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 603-4 (S.D. Ohio 2016); (2) permit counsel retained by an accused student to participate at the hearing, *Henson*, 719 F.2d at 74, *Osteen v. Henley*, 13 F.3d 221, 225-26 (7th Cir. 1993); (3) turn over exculpatory or impeachment evidence to the accused student, *Tanyi v. Appalachian State Univ.*, 2015 WL 4478853, at *5 (W.D.N.C. July 22, 2015) (Voorhees, J.), *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 18 (D. Me. 2005); or

(4) exclude hearsay evidence from the disciplinary hearing, *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d at 602.

Because an accused student's due process rights flow from the Fourteenth Amendment of the United States Constitution, a university's violation of its internal policies and practices governing disciplinary hearings does not, in and of itself, constitute a due process violation. *London v. Dirs. Of the Dewitt Pub. Schs.*, 194 F.3d 873, 877 (8th Cir. 1999); *Jones v. Bd. of Governors of Univ. of North Carolina*, 704 F.2d 713, 717 (4th Cir. 1983). However, the United States Supreme Court has recognized that "significant departures from stated procedures of government and even from isolated assurances by governmental officers which have induced reasonable and detrimental reliance may, if sufficiently unfair and prejudicial, constitute procedural due process violations." *Jones*, 704 F.2d at 717. (citing *United States v. Caceres*, 440 U.S. 741, 752-53, n.15 (1979)); *see also Doe v. Alger*, 228 F. Supp. 3d 713, 731 (W.D. Va. 2016). Furthermore, a court may consider a university's failure to administer a disciplinary proceeding in accordance with internal policies and practices in combination with other errors during the proceeding to conclude that the disciplinary proceeding, on the whole, did not comport with due process requirements. *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 621 (E.D. Va. 2016) (citing *Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 259 (E.D. Pa. 2012)).

Finally, university officials tasked with administering disciplinary proceedings are entitled to a "'presumption that [they] can and will decide particular controversies conscientiously and fairly.'" *Id.* at 620; *see also Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d at 601 ("School disciplinary boards must of course be impartial but they are entitled to a presumption of honesty and impartiality absent a showing of actual bias." (citations omitted)). To overcome this presumption afforded to university officials, a plaintiff may rely on statements or actions of a

university official. *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d at 601. Although a university official does not exhibit bias by reaching a temporary decision regarding the disciplinary proceeding before hearing the accused student's version of events, where a university official reaches a firm conclusion regarding the accused student's guilt prior to hearing the accused student's version of events, the university official's conduct may impair the students opportunity to be heard at a *meaningful* time and in a *meaningful* manner. *See Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d at 620. To this point, while due process does not require absolute neutrality on the part of university officials tasked with investigating and administering disciplinary hearings, a university official crosses the line when he or she directs the investigation or hearing with the primary purpose of obtaining a conviction rather than seeking out the truth.

    ii.    *Analysis of Claim*

Taking Plaintiff's allegations as true and drawing all reasonable inferences in favor of Plaintiff therefrom, this Court concludes that Plaintiff has stated a viable due process claim. Although Plaintiff received adequate notice of the charges against him, the alleged circumstances surrounding the investigation and the timing of the hearing, when coupled with the alleged restraints placed on Plaintiff's attempt to tell his side of the story at the University Conduct Board hearing, permit the inference that Plaintiff's disciplinary hearing did not provide him a meaningful opportunity to be heard at least with respect to his defense against the charge of "unlawful entry." Specific to the investigation and the timing of the hearing, Plaintiff alleges that (1) Defendant Elrod and Defendant Haas directed the investigator to effectively ignore the February 21, 2015 incident when drafting the investigation report provided to the University Conduct Board;[2] (2)

---

[2] Although not sufficient in and of itself to constitute a due process violation, this Court notes that if Elrod and Haas directed Sears to omit facts about the February 21, 2015 incident and doctor the investigative report provided to the University Conduct Board to suggest that Plaintiff and Costa fully terminated their relationship on February 21, 2015, then such direction would contravene App. State's internal policies. (*See* Doc. 29-1; Appalachian State University

Defendant Elrod, after observing two days of the Rule 50(b) hearing on Thursday, September 17, 2015 and Friday, September 18, 2015, and knowing that Investigator Sears was subpoenaed to testify before the Rule 50(b) Court on Monday, October 5, 2015, sent Plaintiff a notice on *Saturday*, September 19, 2015 scheduling Plaintiff's hearing for Friday October 2, 2015, the last business day before Sears would testify before the Rule 50(b) Court; and (3) the University Conduct Board hearing was abruptly scheduled for October 2, 2015 and Defendant Elrod, without explanation, denied Plaintiff's request for a continuance until after the imminent conclusion of the Rule 50(b) hearing—such that Plaintiff could garner his evidence—even though the university investigation had been ongoing for five and a half months. Specific to the hearing, Plaintiff alleges that (1) he was unable to present witnesses or evidence that contradicted the complainant's version of events; (2) Investigator Sears was not present at the hearing despite it being common practice for investigators to be present; and (3) he was unable to question Costa about the events of February 21, 2015.[3]

While any one of these allegations, when viewed in isolation, would be insufficient to sustain a due process claim, when the allegations are viewed in total it is reasonable to conclude that the alleged conduct of the university officials significantly impugned the fairness of the disciplinary proceeding in that the proceeding was intentionally structured in a manner to deter the pursuit of the truth on the unlawful entry charge in favor of obtaining a verdict adverse to Plaintiff.[4]

---

Code of Student Conduct § 6.06b ("The role of the Investigator is to gather information and *impartially review* the alleged incident by interviewing involved parties and witnesses in order to provide a *comprehensive* review of the incident." (emphasis added)); Appalachian State University Code of Student Conduct § 606e ("At the conclusion of an investigation, the Investigator shall prepare a written report that includes a synopsis of *all available relevant information*. . . ." (emphasis added)).

[3] Based on Plaintiff's Complaint and the submissions of the parties, it appears Defendant Elrod was present at Plaintiff's University Conduct Board hearing. The scope of Defendant Elrod's role at the hearing, however, is not apparent at this juncture.

[4] Defendants argue that due process does not afford Plaintiff the right to have his disciplinary hearing after the conclusion of the Rule 50(b) proceeding. Rather than alleging that the scheduling of the hearing before the conclusion of the Rule 50(b) hearing necessarily violated his due process, Plaintiff's Complaint, when viewed on the whole,

Further, the allegations suggest far more than a mere failure to turn over exculpatory evidence and instead are emblematic of a cover up by university officials when the facts discovered during the course of the university investigation did not support the unlawful entry charge.[5] That is, the incident on February 21, 2015, and the potential witness testimony and questions about that incident and Plaintiff's and Costa's relationship, may have demonstrated that Plaintiff and Costa had an understanding that one could enter the other's dorm room without first obtaining explicit consent to enter, thus defeating the "unlawful entry" charge.[6]

To the extent that Plaintiff's Complaint alleges that university officials blockaded Plaintiff's ability to present evidence regarding the nature and understandings of the relationship between Plaintiff and Costa, the university officials deprived Plaintiff of a meaningful opportunity to present his only viable defense to the "unlawful entry" charge. In so concluding, this Court further finds that Plaintiff's Complaint states a plausible claim under the *Matthews* factors in that (1) Plaintiff's private interest in a fair hearing was high given the short-term consequence of a suspension and the long-term reputational ramifications to his pursuit of higher education and employment given that the non-academic suspension is noted on his transcript; (2) assuming

---

alleges that the scheduling of the hearing on the eve of the last day of his court proceeding was part of a concerted effort by Defendant Elrod to deprive Plaintiff of a meaningful and fair hearing before the University Conduct Board. Thus, while Defendants are correct that due process does not require a university to wait for the conclusion of court proceedings to hold a university disciplinary hearing, Defendants' argument misses, and is ineffective, as to the larger implications of Plaintiff's allegations.

[5] It may even be inferred that the investigatory report was drafted in a manner intentionally to mislead the University Conduct Board in that the report stated that Plaintiff's and Costa's relationship ended on February 21, 2015, while, under Plaintiff's alleged version of the facts, university officials responsible for the report knew that Plaintiff and Costa remained in some form of a relationship through the March 28, 2015 incident.

[6] Defendants question whether the February 21, 2015 incident was relevant to the charges against Plaintiff. While the point Defendants raise may be salient with respect to the charge of "acts of harm," any suggestion that prior conduct by Plaintiff and Costa with respect to entering each other's dorm rooms based on an ongoing implicit consent understanding is not relevant to the "unlawful entry" charge defies both the rules of evidence and common sense. Furthermore, the February 21, 2015 incident is relevant in the sense that it gives context to Plaintiff's and Costa's relationship leading up to the March 28, 2015 incident. Finally, unlike university disciplinary hearings involving sexual misconduct charges, cross-examination of Costa about her entry into Plaintiff's room on February 21, 2015 need not have touched on Costa's past sexual history or even her sexual interactions with Plaintiff to assess the facts at issue relative to the unlawful entry charge such that it cannot be argued that the cross-examination might have been precluded by the rape-shield doctrine. *See* Fed. R. Evid. 412; *see also Tanyi*, 2015 WL 4478853, at *3.

Plaintiff's allegations are true, the concealment of facts from the University Conduct Board and the restrictions placed on Plaintiff's presentation of evidence created a significant risk of an erroneous outcome on at least the unlawful entry charge;[7] and (3) including facts about the February 21, 2015 incident, holding Plaintiff's University Conduct Board hearing a few days later where the investigation had been open for five and a half months, and permitting Plaintiff to ask Costa a few questions about the February 21, 2015 incident and present evidence and testimony about his relationship with Costa prior the March 28, 2015 incident would have placed a negligible fiscal or administrative burden on the University.

      iii.    *Qualified Immunity*

Defendants Wallace, Haas, and Elrod argue that even if Plaintiff's Complaint sufficiently alleges a due process violation claim, qualified immunity forecloses Plaintiff's claims against them in their individual capacity. (Doc. 28 at 14-16). "Qualified immunity protects government officials from monetary damages in a suit brought under 42 U.S.C. § 1983, so long as their conduct does not violate any clearly established constitutional or statutory rights of which a reasonable person would have been aware." *Tanyi*, 2015 WL 4478853, at *8 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this sense, the doctrine of qualified immunity protects "all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As this Court has already concluded that Plaintiff alleged sufficient facts to sustain a due process claim, the only question is whether the facts alleged, if substantiated by the evidence, amount to a due process violation that was clearly established by existing law.

---

[7] The Court notes that discovery is necessary to determine what Plaintiff's punishment may have been if the University Conduct Board had only found him responsible for the acts of harm charge and not for the unlawful entry charge/whether the finding of responsibility on the unlawful entry charge enhanced the deprivation imposed. At this juncture in the litigation, this Court must assume that a second finding of responsibility had some impact on the deprivation imposed.

"[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage." *Tobey v. Jones*, 706 F.3d 379, 393-94 (4th Cir. 2013) (citing *Behrens v. Pelletier*, 516 U.S. 299 (1996)). However, because the issue of qualified immunity may turn on the facts of a case, "[o]rdinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). To that point, courts concluding that an accused student alleged sufficient facts to advance a due process claim often reserve judgment on an individual university official's qualified immunity defense until the case reaches the summary judgment stage. *See Tanyi*, 2015 WL 4478853, at *9. With respect to Defendant Elrod, factual development is necessary for this Court to determine if Elrod's conduct (1) actually violated Plaintiff's due process rights; and (2) whether, if Elrod's conduct violated Plaintiff's right to due process, Elrod's conduct was sufficiently egregious objectively to deny Plaintiff a fair hearing and a meaningful opportunity to be heard such that no reasonable government official in Elrod's place could have concluded that the investigation and the University Conduct Board hearing satisfied due process.[8] Most notably, if the facts establish that Elrod abruptly scheduled Plaintiff's University Conduct Board hearing for October 2, 2015 and refused Plaintiff's request for a continuance (which Plaintiff requested in part to give himself time to gather and prepare evidence and witnesses) in Elrod's hopes of preventing the University Conduct Board, and App. State administration generally, from learning about his direction to Sears, it is hard to imagine how a reasonable government official in Elrod's position could believe that such comported with the requirements of due process.[9] Similarly, further factual development is

---

[8] Notably, because this case is at the motion to dismiss stage, this Court does not have the recording of the disciplinary hearing, any affidavits or depositions from the witnesses Plaintiff sought to call, or any admissions, interrogatories, or deposition testimony from the individuals relevant to the disciplinary hearing.

[9] Incidentally, this Court concludes that the allegations in Plaintiff's Complaint, if proven, would be sufficient to overcome the presumption Defendant Elrod is entitled to with respect to acting in good faith and without bias.

14

necessary to determine whether any reasonable government official in Defendant Wallace's position could have reviewed Plaintiff's appeal from the University Conduct Board hearing and the recording of the hearing and concluded that the procedures underlying the investigation and hearing provided Plaintiff with a meaningful opportunity to be heard.

This Court, however, is able to reach a conclusion with respect to Defendant Haas's qualified immunity defense. Based on the factual allegation in Plaintiff's Complaint, the only action attributable to Defendant Haas is that Defendant Haas, along with Defendant Elrod, instructed Investigator Sears to omit facts relative to the February 21, 2015 incident from the report provided to the University Conduct Board. (*See* Doc. 1 at 5). Assuming Plaintiff can prove that Haas directed Sears to omit relevant details from the report, this lone action by Haas is insufficient to overcome the limitation imposed by qualified immunity because no binding precedent clearly establishes that directing an investigator to file an incomplete or misleading report, in and of itself, denies an accused student of a meaningful opportunity to be heard. Nor would a reasonable government official recognize that binding precedent discussing due process on a general level rendered this action a deprivation of due process. Accordingly, Plaintiff's Fourteenth Amendment due process claim against Defendant Haas in her individual capacity is **DISMISSED WITH PREJUDICE**.

    C.    <u>Procedural Due Process Claim under North Carolina Constitution</u>

Article 1, Section 19 of the North Carolina Constitution protects individuals from due process violations by the state of North Carolina and its officials and states, "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." Article 1, Section 19's "'law of the land' clause is interpreted to be analogous with the Fourteenth

Amendment 'due process of law' clause." *City of Asheville v. State*, 665 S.E. 2d 103, 133 (N.C. App. Ct. 2008). Accordingly, to the extent Plaintiff has alleged a viable due process claim under the Fourteenth Amendment he has also alleged a viable claim under Article 1, Section 19 of the North Carolina Constitution.

Apart from arguing that Plaintiff fails to state a viable due process claim, Defendants argue that this Court should dismiss Plaintiff's claim under Article I, Section 19 of the North Carolina constitution because Plaintiff did not exhaust his state law remedies before bringing this action. (Doc. 28 at 21). Under North Carolina law, where an adequate state law remedy exists, a plaintiff may not bring a corum claim for a constitutional violation without first exhausting that state law remedy. *Swain v. Elfland*, 550 S.E.2d 530, 536 (N.C. Ct. App. 2001). In his Response, Plaintiff argues that no adequate state law remedy existed for him to fully administratively appeal the suspension imposed. (Doc. 29 at 14 (citing "UNC Policy Manual Chapter 100.1-*The Code* Section 502 page 3 of 3")). Defendants Reply brief does not acknowledge or counter Plaintiff's argument regarding the availability of an adequate state law remedy. (*See* Doc. 30 at 8-9). As failure to exhaust state law remedies is an affirmative defense, *see Paschal v. Myers*, 497 S.E.2d 311, 313-14 (N.C. Ct. App. 1998), and as this Court's research has not revealed a North Carolina case applying the state law remedy exhaustion defense to an action stemming from a North Carolina University System student disciplinary proceeding, this Court declines, at this juncture, to dismiss Plaintiff's due process corum claim under Article 1, Section 19 of the North Carolina Constitution.[10]

---

[10] This Court's declination to dismiss Plaintiff's due process corum claim under Article 1, Section 19 of the North Carolina Constitution does not preclude Defendants from raising, and more fully briefing, this issue on summary judgment. Separately, this Court, however, does note that to the extent Plaintiff's Complaint seeks money damages against any of the Defendants in their individual capacities, the claim would not conform with North Carolina law. *Swain*, 550 S.E.2d at 536.

16

D.     Equal Protection and Title IX Claims

Counts Three, Four, and Five of Plaintiff's Complaint respectively assert claims of discrimination based on gender under the equal protection clause of the Fourteenth Amendment, under the equal protection clause of Article I, Section 19 of the North Carolina Constitution, and under Title IX. Plaintiff premises his claim on the scope of App. State's investigation of his claim against Costa for the February 21, 2015 incident compared to the investigation into Costa's claim against him for the March 28, 2015 incident and on the disparities in the punishments imposed on him and Costa—he received a suspension while Costa received two weeks of on-campus probation. Defendants argue that Plaintiff and Costa were not similarly situated and that, even if the two were similarly situated and Costa received more favorable treatment, Plaintiff's Complaint fails to plead sufficient facts alleging that the disparity in treatment was the result of any discriminatory animus by Defendants on the basis of gender. (Doc. 28 at 16-20; Doc. 30 at 9-13).

To sustain an equal protection claim, a plaintiff "must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equality in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011); *see also Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) ("To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."). An equal protection claim under Article 1, Section 19 of the North Carolina Constitution is subject to the same analysis as an equal protection claim under the Fourteenth Amendment. *State v. Fowler*, 676 S.E.2d 523, 544

(NC. St. App. 2009); (*see also* Doc. 29 at 16 (Plaintiff conceding that analysis is the same for federal and state equal protection claims)).

Plaintiff's equal protection claims fail for two reasons. First, Plaintiff fails to identify a similarly situated individual. While there are, undoubtedly, some similarities between Plaintiff and Costa, there are also key differences. Of some import to the similarly situated analysis, the charges against Plaintiff and Costa differed and the charges against Plaintiff were more numerous. Of significantly greater import, Costa accepted responsibility for the charges, while Plaintiff challenged the charges. Costa's acceptance of responsibility would have naturally limited the extent of any investigation. It is also well recognized that individuals who accept responsibility for their actions often receive lesser punishments than those who deny responsibility and are ultimately adjudged responsible. Second, even assuming that Plaintiff and Costa were similarly situated, Plaintiff's Complaint does not contain any allegations permitting a non-speculative inference that any disparity in treatment was the result of discriminatory animus on the basis of gender by any of the Defendants. Notably, while Plaintiff's allegations may be sufficient to permit an inference that Defendant Elrod acted in a biased manner against Plaintiff, Plaintiff does not allege any facts—such as statements by Elrod or prior conduct by Elrod or App. State—that suggest that any bias by Elrod was attributable to Plaintiff's gender as opposed to the result any number of possible non-protected factors such as Elrod's interactions with Plaintiff or items in Plaintiff's record not presently known to the Court.[11] Finally, Plaintiff's conclusory allegation that he was treated "unequally because of his gender" does not save his otherwise deficient Complaint.

---

[11] Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Much as Plaintiff's Complaint fails to allege facts supporting an inference of discriminatory animus on the basis of gender for purposes of Plaintiff's equal protection claims, Plaintiff's Complaint likewise fails to contain sufficient allegations to support an inference of discrimination on the basis of sex for purposes of his Title IX claim.

*See Iqbal*, 556 U.S. at 678. Accordingly, Defendants' Motion to Dismiss is **GRANTED** with respect to Counts Three, Four, and Five of Plaintiff's Complaint and those counts are **DISMISSED**.

## III. DECRETAL

**IT IS, THEREFORE, ORDERED THAT**:

(1) Defendants' Motion to Dismiss (Doc. 27) is **GRANTED IN PART** and **DENIED IN PART**;

(2) Plaintiff's Count Two due process claim against Defendant Hass in her individual capacity is **DISMISSED WITH PREJUDICE** based on principles of qualified immunity;

(3) Plaintiff's Count Three and Count Four equal protection claims under the Fourteenth Amendment of the United States Constitution and under Article 1, Section 19 of the North Carolina Constitution respectively and his Count Five claim under Title IX are all **DISMISSED** in their entirety; and

(4) Consistent with this Order, Plaintiff may proceed on all other claims.

Signed: August 28, 2017

Richard L. Voorhees
United States District Judge